In the Matter of the Claim of MILDRED GREENSMITH, Respondent, *v.* FRANKLIN NATIONAL BANK et al., Appellants. WORKMEN'S COMPENSATION BOARD, Respondent.

Third Department, July 30, 1964.

*Minore & Manes (Joseph L. Minore* of counsel), for appellants.

*Henry J. Capobianco* for claimant-respondent.

*Louis J. Lefkowitz, Attorney-General (Daniel Polansky* and *Morris N. Lissauer* of counsel), for Workmen's Compensation Board, respondent.

GIBSON, P. J. Claimant, employed as an analysis clerk in a commercial bank, after the removal of a door near her desk was subjected, during a period of over three months, to a cold draft on her back from an air conditioner. To mitigate the discomfort, she changed her posture in such fashion as to result in her holding her neck and shoulders in a strained and awkward position. A few days after the initial exposure she suffered a '' spontaneous onset of pain in the cervical area '', this suggesting to her physician '' a myositis or arthritic disturbance ''; and three months later, while she was at work, her neck suddenly '' collapsed '' and, as she testified, '' my head broke down, it went over and I couldn't pick it up any more ''. Claimant was unable to work for some time thereafter.

Her consultant neurologist made a diagnosis of myositis which, in addition to its usual effects, aggravated a pre-existing arthritis, the doctor testifying: "Any irritation of the muscular structures of the neck with spasm would aggravate the arthritic condition, and one of necessity is related to the other." Amplifying his finding of causation, he said that an unusual draft, eliciting irritation and spasm, would render her uncomfortable, tight and tense, so that she would tend to assume a protective posture, working with her shoulders in an awkward position — "all these factors, with posturing, with positional changes, could contract and trigger the mechanism which would throw that neck into spasm and start the whole thing [sic] cycle going." This court has previously recognized a myositis thus caused as being the result of an industrial accident. (Matter of Pioli v. Crouse-Hinds Co., 281 App. Div. 737.) Claimant's treating physician diagnosed radiculitis, for which he found causal relationship. Appellants' expert diagnosed "[u]nrelated myositis".

Upon evidence which we account clear and substantial, the board found "that removal of the door near the claimant's desk exposed claimant to a hazardous draft from which she had to protect her neck, that the exposure to hazardous draft and the position in which she kept her neck resulted in accidental injury to the neck." It is urged, however, that there is no evidence of an accident "assignable to a determinate or single act" or "to something catastrophic or extraordinary", within the holding in Matter of Lerner v. Rump Bros. (241 N. Y. 153, 155). It may well be that the strictness of this concept of accident has been modified somewhat by more recent decisions, such as that in Matter of Schechter v. State Ins. Fund (6 N Y 2d 506), in which, over a period of seven weeks, a trial attorney was subjected to emotional and physical stresses of various kinds and suffered occasional chest pains, culminating in a heart attack at home; and such as that in Matter of Masse v. Robinson Co. (301 N. Y. 34) in which, indeed, Lerner seems to have been one of the authorities upon which the unsuccessful respondents, as well as the Appellate Division, largely relied (pp. 36–37); but whether or not the stricter standard of Lerner remains unmodified, the record before us clearly discloses accident, even within the Lerner rule. It would seem difficult to find an act and event which could be more properly described as "determinate" and "catastrophic" than this sudden neck collapse, following trauma and strain which, to repeat the language of claimant's neurologist, "could contract and trigger the mechanism which would throw that neck into spasm and

start the whole   \*   \*   \*    cycle going.'' Certainly the sudden and dramatic collapse of claimant's neck was evidence of accident at its clearest. It seems impossible to make any legal distinction between a collapse of this nature, following three months' exposure to draft and abnormal posture, and the classic cardiac collapse following days or months of strain, for which awards are now made as a matter of course. (See, e.g., *Matter of Schechter* v. *State Ins. Fund,* 6 N Y 2d 506, *supra.*) '' We think the average man would say that so swift and harsh a disablement was an accidental injury when it was so strangely suffered in the ordinary day's work''; as was said in *Matter of Lurye* v. *Stern Bros. Dept. Store* (275 N. Y. 182, 185) in which, upon facts quite similar to those before us, the court reinstated an award and distinguished *Lerner,* saying (pp. 184–185): '' In the *Lerner* case the employee passed from a hot room into a cold one. The specific result was something that was almost as likely to occur as not. What was presented, the court said, was ' a case of ordinary exposure resulting in a cold.' We thought that to the average man there would seem to be no accident in such a sequence of events.  \*  \*  \*   In the case at hand the claimant was struck by air propelled by the fan. The result was ' palsy which is limited to one side of the face and is acute in onset and called Bell's '—with consequent distortion of the parts and of the powers of expression ''; the court thereupon finding that '' swift and harsh  \*  \*  \*   disablement '' an accidental injury.

The case for decision is, also, clearly within the class of gradual-injury cases recognized by Dean Larson, who says: '' It has generally been assumed that the accident concept includes an element of reasonable definiteness in time, as distinguished from gradual disintegration or deterioration  \*  \*  \*   It has been shown above that the concept of time-definiteness can be thought of as applying to either the *cause* or the *result.* A relatively brief exposure to fumes, dust or cold may lead to a protracted period during which the victim gradually succumbs to disease; conversely, months or years of exposure to poisons, jolts or strains may lead to a *sudden collapse on a particular day.* In either case it is relatively easy to satisfy the definite-time requirement by merely accepting the view that suddenness may be found in either cause or result.'' (1 Larson, Workmen's Compensation Law, § 39.10; emphasis supplied.) Discussing the compensable gradual-injury cases which he classifies as to '' suddenness of result '', the same author observes that '' in various situations an otherwise-gradual kind of deterioration may culminate in an obvious and sudden collapse or structural

change whose incidence can fix the date of accident clearly. Weeks of overwork and strain may lead to coronary thrombosis; several days' work in heat may cumulatively produce heat prostration; 12 hours' glare of the sun may finally bring on snow blindness; repeated jarrings or strains may ultimately lead to a herniation of an intervertebral disc; or a long period of working in a strained crouching position may culminate in a ' dropped foot.' An examination of the unsuccessful cases will reveal very few in which a clean-cut collapse occurred." (*Op. cit.*, § 39.30.)

Consistently with these concepts, the repeated insults of the cold air and the postural strains over a period exceeding three months, culminating in a sudden collapse, all as found in this case, are paralleled by the automobile repairman's exposure to carbon monoxide gas over a period of two years, until on a particular day he had a dizzy spell and fainted and two years later died of endocarditis, found the result of accidental injury caused by his inhalation of the gas. (*Matter of Reichard* v. *Franklin Mfg. Co.*, 223 App. Div. 797, affd. 249 N. Y. 525.) The facts here are comparable, also, to the molder's day-to-day twisting and turning of his body as he dipped and poured molten metal, until the specific occasion when he felt a sensation like a shock in his neck and was found, as was claimant-respondent here, to have myositis caused by industrial accident. (*Matter of Pioli* v. *Crouse-Hinds Co.*, 281 App. Div. 737, *supra.*) The basic proof here is also comparable to that of the repeated traumas and burns sustained by a presser using a steam iron, resulting, some time after their apparent healing, in a ruptured artery. (*Matter of Neilson* v. *Stern & Co.*, 282 App. Div. 793, mot. for lv. to app. den. 306 N. Y. 980.) (See, also, *Matter of Robbins* v. *Enterprise Oil Co.*, 252 App. Div. 904, affd. 278 N. Y. 611.)

The cases cited in the dissenting opinion are inapposite, because, as seems abundantly clear, the specificity lacking in those cases, and constraining denials of awards, is present in this.

The decision should be affirmed.

REYNOLDS, J. (dissenting). I agree with the dissenting member of the board and with a statement made by the Referee in the record before making the award that there was nothing accidental here. It seems clear that the record is without evidence to support the finding of an accident. Additionally, in my view, there is no substantial evidence in the record upon which a finding of causal relationship could be made.

I would like to discuss first the question of whether there was any probative medical evidence to support a finding that claimant's condition was attributable to her exposure to the air conditioner, rather than to a pre-existing arthritic condition in her neck with which claimant had been afflicted for more than six years prior to her present difficulty. Claimant with respect to the instant attack asserts that after noticing some numbness in her fingers and aches and pains in her arms she suddenly woke up on February 22, 1962, a holiday, at her home with a severe pain in her neck. It is notable that there is here a striking similarity between these symptoms and those claimant described as attendant with her earlier affliction. Claimant thereupon returned to Dr. Bendet, the physician who had treated her prior condition, who told her that her present trouble was a continuation of the original cervical arthritis and rendered treatment for which claimant paid him. No history of an industrial accident was given. Claimant returned to work and indicated to her employer nothing of her condition or that she was in physical distress of any sort until on or about May 22, 1962, three months after the outset of the pain, when she merely told a supervisor that she had to leave early to go to a doctor. Certainly there was no complaint that she was exposed to a cold draft which allegedly necessitated an unnatural posture. This position was first presented at the hearings. She then went to Dr. Meister who discovered her neck had collapsed. Then on May 29, 1962 claimant made a formal claim for disability benefits for her condition, on which she specifically indicated she was not making any claim under the Workmen's Compensation Law. Her attending physician, Dr. Meister, unequivocally stated that there was no relationship to either accident or occupation. By her own admission it was not until after Dr. Meister told her she might need an operation that she even thought of making a compensation claim and the claim was not filed until August 24, 1962. Further, claimant's own experts, in addition to being unable to agree as to what the nature of her present ailment is, both admit the definite possibility that it could be a reoccurrence of her prior arthritic affliction. Dr. Epstein testified: " The history of the constant exposure with the relation of the symptomatology *could possibly be related to that factor.* However, we have to be constantly aware of the fact that she apparently just awakened on one morning and complained of the severe pain in her right arm and shoulder. Usually with the constant irritative effect the symptom will begin gradually, gradually get worse, *when they begin suddenly, the way they did in this woman, the arthritic factor may very*

*well be the more competent producing* cause.'' (Emphasis supplied.) Dr. Meister's entirely about face opinion is worthless because it is bottomed upon the premise completely unsupported by the record that this claimant was in a '' terrific draft with gusts of air on her back ''. This is not supported in the record, even by the claimant. (*Matter of Cunningham* v. *Neisner Bros.*, 9 A D 2d 965.)

There remains the primary question as to whether the facts support the majority of board's finding of an industrial accident. I do not believe they do. An accident within the meaning of the Workmen's Compensation Law must be '' assignable to a determinate or single act, identified in space or time '' or '' to something catastrophic or extraordinary '' (*Matter of Lerner* v. *Rump Bros.*, 241 N. Y. 153, 155; see, also, *Matter of Hoare* v. *Great Atlantic & Pacific Tea Co.*, 8 A D 2d 561; *Matter of Conroy* v. *Rupert Fish Co.*, 8 A D 2d 553). The majority finds such a '' catastrophic '' and '' determinate '' event in claimant's sudden neck collapse and analogizes the situation to the cardiac collapse cases. This very court, however, in *Matter of Deyo* v. *Village of Piermont* (283 App. Div. 67, 69), a case analagous to the present one, dispelled such an analogy when it stated: '' We are mindful of the trend in the so-called ' heart cases ' to somewhat relax the rule that the work or exertion must be unusual or beyond normal duty, providing the attack occurs from the exertion of the work. (*Matter of Masse* v. *Robinson Co.*, 301 N. Y. 34; *Matter of Gioia* v. *Courtmel Co.*, 283 App. Div. 40.) However, we do not think the interpretation of what constitutes an ' accident ' should be extended to fringe cases such as this, where there is no single incident which would be regarded as an accident by the common man. There must be some element of suddenness — something catastrophic — and some incident immediately noticeable.'' The Court of Appeals in *Matter of Lerner* v. *Rump Bros.* (*supra*, p. 156) stated what I believe to be the controlling rule here: ''The exposure, although occurring at a definite time and place, was not catastrophic or extraordinary. It was like the exposure to drafts when one is heated while at work or to the change between cold and wet outside and the warmth inside which is not unfrequently encountered by the workman after coming to his work in inclement weather. Such contacts of the body with the draft or with the changes of temperature are natural and normal and often unavoidable in the conduct of a business. A resulting cold would present itself as a disease and not as an accident.'' This position has been reaffirmed repeatedly by the Court of

Appeals and this court (e.g., *Matter of Horn* v. *Pals & Solow*, 299 N. Y. 575; *Matter of Vaughan* v. *Bushwick Iron & Steel*, 10 A D 2d 659; *Matter of Foley* v. *Rensselaer County Dept. of Health*, 8 A D 2d 894; *Matter of Conroy* v. *Rupert Fish Co.*, *supra*; *Matter of Hoare* v. *Great Atlantic & Pacific Tea Co.*, *supra*; *Matter of Robinson* v. *News Syndicate Co.*, 3 A D 2d 879). Nor does the case of *Matter of Lurye* v. *Stern Bros. Dept. Store* (275 N. Y. 182) portend a different result. There the claimant while "terribly perspired" was suddenly and directly exposed to an electric fan as a result of which she "got a dreadful chill" which continued until she arrived home and the very next morning awoke paralyzed. There is here none of this suddenness. Rather the exposure was slight if prolonged and the muscle inflammation which led to the collapse a gradual process. The only events that happened with any suddenness were the painful onset of February 22, 1962 which Dr. Meister attributed to her prior arthritic condition and the end result, the collapse. I can thus find no evidence of accident in the instant record. " [T]his is not such an incident as would be considered an accident by the common man." (*Matter of Vaughan* v. *Bushwick Iron & Steel*, 10 A D 2d 659, 660.)

To sweep the precedents under the rug with the obscure reference to "lack of specificity" and to extend this field under the umbrella of *Matter of Schechter* (6 N Y 2d 506) and the highly debated results in some of the heart cases seems completely unwise and unwarranted. Such action is unrealistic and places an intolerable burden on New York State industry.

The decision and award should be reversed and the claim dismissed.

TAYLOR, AULISI and HAMM, JJ., concur with GIBSON, P. J.; REYNOLDS, J., votes to reverse in opinion.

Decision affirmed, with costs to the Workmen's Compensation Board.